UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

BEVERLY ANN FORD,                  )
                                   )
              Plaintiff,           )
                                   )
      v.                           )        No.  1:16 CV 140 JMB
                                   )
                                   )
NANCY A. BERRYHILL,[1]             )
Acting Commissioner of Social Security,   )
                                   )
              Defendant.           )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Beverly Ann Ford ("Plaintiff") for Supplemental Security Income benefits under 42 U.S.C. §§ 401 et seq. ("the Act").  Plaintiff has filed a brief in support of the Complaint.  (ECF No. 16)  The Commissioner filed a brief in support of the Answer and Plaintiff filed a reply brief.  (ECF Nos. 22 and 24)  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c).  (ECF No. 8)  For the reasons stated below, the Commissioner's decision is reversed and the matter is remanded.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Background**

I.      **Relevant Procedural History**

In August 2013, Plaintiff filed an application for disability benefits, claiming that her disability began on October 1, 2009.[2] (Tr. 140)[3] On September 23, 2013, the Commissioner denied Plaintiff's claims upon initial consideration. (Tr. 63)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 90) Plaintiff appeared at the hearing with counsel on September 11, 2014, and testified concerning the nature of her disability, her daily activities, functional limitations, and past work. (Tr. 28-60) The ALJ also received testimony from Darrell W. Taylor, Ph.D., a vocational expert ("VE"). Dr. Taylor offered opinions as to Plaintiff's ability to return to her past work, as well as her ability to secure other work in the national economy, based upon several hypothetical questions. (Tr. 52-58) The ALJ issued a decision on February 13, 2015 ("the Decision"), finding that Plaintiff was not disabled. (Tr. 10-22)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration. (Tr. 6-9) On April 19, 2016, the Appeals Council denied review of Plaintiff's claims, making the February 2015 decision of the ALJ the final decision of the Commissioner. (Tr. 1-5) Plaintiff has therefore exhausted her administrative remedies. See 42 U.S.C. § 405(g).

In her brief to this Court, Plaintiff contends that the ALJ's decision is not supported by substantial evidence for two independent reasons. First, Plaintiff contends that that the ALJ

---

[2] Plaintiff applied for disability benefits at least twice before. It appears that she was denied at the initial stage in November 2005 and again in August 2011. (Tr. 64) Application materials from the second episode are included in the transcript of this case.

[3] "Tr." refers to the administrative record filed on behalf of the Commissioner.

improperly relied on the VE's testimony. More specifically, Plaintiff contends that the VE's testimony conflicts with the *Dictionary of Occupational Titles* ("DOT") and its companion *Selected Characteristics of Occupations* ("SCO"), and the ALJ did not adequately resolve the conflicts. Second, Plaintiff argues that the ALJ erred in failing to consider whether to treat Plaintiff as "approaching advanced age" rather than a "younger person" under the Medical-Vocational Guidelines. (ECF No. 16 at 5, 9)

## II.    Plaintiff's Disability and Function Reports and Hearing Testimony

Plaintiff was born August 18, 1965. (Tr. 218) She was therefore 47 years old when she filed the present application for disability benefits, and was 49 years, 5 months and 26 days old on the day the ALJ issued his Decision. She is divorced with two adult children. (Tr. 33) She served approximately two years in the Illinois Department of Corrections between June 2011 and June 2013 for passing bad checks. (Tr. 39)

Plaintiff can speak, read and understand English, completed high school and trained as a Certified Nurse Assistant. (Tr. 33, 209, 211) Plaintiff's relevant job history includes managing a snack bar at Wal-Mart, making food at a Casey's General Store, working as a cashier at a truck stop, repackaging products in a factory, and working on a cereal-packaging line. (Tr. 34-38) At the hearing, Plaintiff testified that she lost the Wal-Mart job due to absenteeism related to mental and family problems. (Tr. 35) She testified that she lost the truck stop job for being accused of stealing "some things that I did not take," but since she was not formally charged she regarded it as "conflict with the manager." (Tr. 36) Plaintiff testified at the hearing that she left her last job, which was with Gilster-Mary Lee, due to absenteeism caused by back problems.[4] (Tr. 38)

Plaintiff described her medical conditions as including major depression, schizoaffective

---

[4] Her testimony is in apparent conflict with her 2011 application where she represented that she stopped working due to a lack of transportation. (Tr. 162)

disorder, bipolar depression, back problems, and hepatitis C. (Tr. 210) At the hearing, she described her back pain as her worst problem, followed by her mental health issues and hepatitis. (Tr. 38-39) Plaintiff explained that she had a "spacer" surgically inserted at the T12 vertebra, and that she has "a lot of problems with bending and standing for very long, or actually even sitting in one spot for very long." (Tr. 38) Although the back surgery occurred in 2003, she continued working for several years. (Tr. 40) Plaintiff described her back pain as making it difficult to straighten up from a bent-over position, and that she usually needs help in going from a seated position to standing. (Id.) She also described intermittent feelings of numbness in her legs. (Id.) Plaintiff represented that she falls frequently (approximately a dozen times in the prior year), and that her doctor thought it was related to the back surgery. (Tr. 39-40, 50) As of the hearing, Plaintiff had recently begun using a cane for stability. (Tr. 40) She stated that she did not have any symptoms from the hepatitis, other than possibly some pain. (Tr. 46) Her history of mental illness, discussed at more length below, includes reports of auditory hallucinations (in the form of largely unintelligible voices) which can persist for minutes or days, as well as suicidal thoughts. (Tr. 41-44) She also reports random crying on a "good" day, and not getting out of bed at all on a "bad" day. (Tr. 50-51)

At the time of the hearing, Plaintiff was primarily living alone. (Tr. 33) She was receiving Medicaid benefits at that time. (Tr. 34) She did not have a driver's license, having lost it due to "driving someone else's vehicle and got pulled over for a headlight out. And they found a marijuana pipe in the car." (Tr. 45) Plaintiff shopped for groceries monthly with her son. (Tr. 45-46) On her 2011 Function Report,[5] Plaintiff stated that she went outside every day; at the 2014 hearing she stated that it was once or twice per month. (Tr. 46, 183) Plaintiff's testimony

---

[5] There is no indication that Plaintiff submitted a Function Report or update with her 2013 application.

indicates that she did not have many friends and did not socialize much. (Tr. 48-49) In her 2011 Function Report, Plaintiff stated that she cooked daily (although it would usually be simple means such as sandwiches and frozen dinners) and had no issues with personal care or money management. (Tr. 182-183) At the hearing, Plaintiff stated that she washed the silverware and did laundry with assistance from her son. (Tr. 49-50)

At the hearing, Dr. Taylor was asked hypothetical questions about an individual of Plaintiff's age, education, work experience, with a residual functional capacity ("RFC") as follows: she could lift and carry 20 pounds occasionally and 10 pounds frequently; she could sit for six hours in an eight-hour day; she could stand or walk for six hours in an eight-hour day with a cane for assistance while walking but not while standing; she could not climb ladders, ropes or scaffolds; and she could only occasionally balance, kneel, crouch, crawl, stoop climb ramps or climb stairs; she could frequently reach, but not overhead with her left arm; and she would be able to handle simple and routine tasks that involve working primarily with things rather than people, which can be performed independently in a non-public setting, and that would involve no more than occasional interaction with coworkers and supervisors. (Tr. 54-55)

Dr. Taylor, the VE, testified that such an individual would not be able to perform Plaintiff's past work. (Id.) The VE explained that such an individual, even with the use of a cane, would still be able to perform other work, such as a hand packer (DOT 920.687-030), production worker assembler (DOT 559.687-034) or a surveillance system monitor (DOT 379.367-010). Dr. Taylor testified that there were approximately 32,000 hand packer positions nationally, as well as 14,000 assembler positions and 18,000 surveillance monitor jobs. (Id.) Each of these jobs is rated at the sedentary exertional level, and has a specific vocational preparation level of 2 (i.e. unskilled). (Id.)

The ALJ specifically asked the VE whether there were any conflicts between his testimony that someone in Plaintiff's position could perform these jobs and the information about these jobs contained in the DOT and its companion SCO. (Tr. 56) Dr. Taylor replied that his testimony was consistent with the DOT, except regarding use of a cane and what an acceptable absence rate would be, for which he cited his own job analysis and professional experience. (Id.)

**III**.    **Medical Evidence**

The administrative record before this Court includes medical records from several sources, including hospitals and the Illinois Department of Corrections. They are summarized in pertinent part here.

On November 30, 2009, Plaintiff went to the Southeast Missouri Hospital emergency room for coughing and difficulty breathing. (Tr. 283) She was not taking any medications at the time. (Id.) Plaintiff was noted as having no neck, back or upper extremity pain. (Tr. 285) She was diagnosed with an upper respiratory infection and bronchitis. (Tr. 285-286)

On January 11, 2010, Plaintiff was again seen at the Southeast Missouri Hospital emergency room for treatment of an infected scratch on her face. (Tr. 276) She was not recorded as taking any medications at the time. (Id.) Plaintiff was noted as having a normal, steady gait and no neck, back or upper extremity pain. (Tr. 276, 279)

Plaintiff was seen at Southeast Missouri Hospital on February 23, 2011, complaining of aching lower back pain radiating down her right leg. (Tr. 265) She stated that she had fallen over a dog while feeding goats the day before. (Tr. 267) Plaintiff was observed as having a steady, normal gait. (Tr. 265) She was given injections of Norflex and morphine, prescriptions for Vicodin and Flexeril and was discharged approximately an hour after presenting. (Tr. 266)

Plaintiff was again seen at Southeast Missouri Hospital on February 28, 2011, reporting that she had run out of her psychiatric medication a month prior and was having suicidal ideation and auditory hallucinations. (Tr. 258, 262) She was admitted to the psychiatric unit, although the record does not clearly indicate when she was discharged. (Tr. 262)

On or about March 9, 2011, Plaintiff was seen by Dr. James Kerr, D.O., for psychological care at the Community Counseling Center. (Tr. 306) Dr. Kerr recorded clinical impressions of bipolar disorder not otherwise specified (elsewhere noted as "with psychotic features"), marijuana and benzodiazepine abuse, borderline personality disorder and hepatitis C. (Tr. 308) Plaintiff was prescribed Risperdal, Lamictal, doxepin and Ambien. (Tr. 306)

On April 19, 2011, Plaintiff was admitted to Southeast Missouri Hospital, reporting that she was hearing voices telling her to harm herself. (Tr. 323) She had apparently been accused of stealing her roommate's pain medication, and was concerned that it would result in further imprisonment. (Id.) Dr. John Lake, M.D., examined Plaintiff and recorded diagnoses of schizoaffective disorder with a history of opiate abuse, as well as borderline personality disorder. (Tr. 324) Dr. Lake substituted Trilafon for Risperdal, and doxepin and Ambien were discontinued in favor of Lunesta and Remeron. (Id.) Plaintiff was discharged on April 22, 2011. (Tr. 320)

On May 12, 2011, Plaintiff again saw Dr. Kerr. (Tr. 311) It does not appear that he altered her medication regimen in any significant way, and set her for a three-month follow-up appointment. (Id.)

On May 23, 2011, Plaintiff was again seen at Southeast Missouri Hospital's emergency department, this time for left arm pain that "feels like a pulled muscle." (Tr. 316) She displayed some limitation in her range of motion in her left shoulder. (Tr. 317) An x-ray of her shoulder

was unremarkable.  (Tr. 319)  She denied any depression.  (Tr. 316)  Plaintiff was diagnosed with tendonitis, prescribed Norco and ibuprofen and discharged.  (Tr. 318)

During her time in the Illinois Department of Corrections, Plaintiff was seen several times by health services.  She was taking Risperdal and Lamictal for most of her stay, although the physicians discontinued the Risperdal in November 2012 (Tr. 415, 418, 451, 453, 454, 459, 462-464, 487)  During her incarceration, Plaintiff appears to have had an episode of suicidal feelings which resolved.  (Tr. 429)  She also had several episodes of back pain, always treated with over-the-counter pain relievers, sometimes supplemented with robaxin or methylprednisolone.  (Tr. 430, 456, 460, 468, 469)  For one particularly prolonged episode of back pain, Plaintiff was given Toradol.  (Tr. 470)  Plaintiff's hepatitis was monitored but apparently untreated.

On July 15, 2013, Plaintiff returned to Southeast Missouri Hospital complaining of lower back pain.  (Tr. 355)  Plaintiff stated that she had fallen the night before.  (Tr. 359)  An x-ray of the lumbar spine revealed no acute issues, showing only the prior fusion.  (Tr. 362)  She was noted as having full muscle strength and was diagnosed with a muscle strain.  (Tr. 357-358)

On July 25, 2013, Plaintiff was seen by therapist Michael Hester at Community Counseling Center at the insistence of her parole officer.  (Tr. 377)  At that time, she denied any suicidal ideation and had current complaints of anxiety and depression.  (Id.)  Plaintiff also stated that the auditory hallucinations had "tapered off over the last few years."  (Id.)  She reported approximately ten psychiatric hospitalizations, as well as four to five suicide attempts between 2000 and 2009.  (Tr. 378)  Plaintiff reported that she had run out of the Lamictal she had been taking in prison the month before.  (Id.)  Despite this, she displayed a normal mood, logical and coherent thought processes, and apparently normal intelligence and memory.  (Tr. 380)  Mr.

Hester noted that Plaintiff's anxiety "does not seem severe enough to meet diagnostic criteria." (Id.) He found that Plaintiff met the criteria for Bipolar I Disorder, Most Recent Episode with Psychotic Features, and noted Dr. Kerr's prior diagnosis of borderline personality disorder. (Id.) Her substance abuse evaluation reported amphetamine and cannabis dependence. (Id.)

On September 18, 2013, Plaintiff was seen by psychiatrist Courtney Johnson, M.D., also at the instigation of the Department of Corrections. (Tr. 373) She stated that she was still not taking her prescribed Lamictal, having run out when she was released from prison. (Tr. 374) She displayed a stable, euthymic affect, as well as a "fair fund of knowledge," intact concentration, memory and orientation. (Tr. 375) Dr. Johnson prescribed Abilify. (Tr. 376)

On October 9, 2013, Plaintiff saw Dr. Johnson for a follow-up. (Tr. 370) She presented as "mostly irritable" though neurologically intact. (Id.) Dr. Johnson raised her dosage of Abilify in response to a reported lack of benefit at the current dosage. (Id.)

On November 18, 2013, Plaintiff saw Dr. Johnson again. (Tr. 368) She had self-discontinued the Abilify two weeks prior, complaining that it made her tired if taken during the day and caused problems staying asleep if taken at night. (Id.) Dr. Johnson prescribed Saphris instead. (Tr. 369)

On August 21, 2014, Plaintiff saw Dr. Qi Liu, M.D., to establish care as her primary care physician. (Tr. 392) She stated that she had chronic back pain that comes and goes at the T12 level, and exhibited tenderness over her lower thoracic spine. (Tr. 394) Plaintiff displayed otherwise normal curvature, tone, motor strength and gait. (Id.) Plaintiff displayed normal mood, affect, orientation and memory, and reported no depression. (Id.) Dr. Liu discussed Plaintiff's bipolar disorder with her, though Plaintiff stated that she was "doing well" and did not want to see a psychology/psychiatry provider. (Tr. 395) It appears that Plaintiff was taking no

medications at all at the time of this visit. (Tr. 392)

Plaintiff presented to Union County Hospital's emergency department on September 3, 2014, complaining of back pain radiating into her left leg after falling the night before. (Tr. 497-498) X-rays indicated minor scoliosis, facet arthropathy, and mild narrowing of disc spaces. (Tr. 504-505) She was prescribed Tylenol, Flexeril and prednisone. Plaintiff followed up with Dr. Liu on September 5, 2014. (Tr. 399) Dr. Liu's only treatment was a 30-day supply of Norco. (Tr. 401) Plaintiff again presented with normal mental and neurological status. (Id.)

### Standard of Review and Legal Framework

To be eligible for disability benefits, Plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 CFR § 404.1520, "[t]he ALJ follows the familiar five-step process to determine whether an individual is disabled…. The ALJ consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her

impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.   The credibility findings made by the ALJ.
2.   The claimant's vocational factors.
3.   The medical evidence from treating and consulting physicians.
4.   The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5.   Any corroboration by third parties of the claimant's impairments.
6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Sec'y of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. <u>Id.</u>; <u>see also</u> <u>McNamara v. Astrue</u>, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## <u>The ALJ's Decision</u>

The ALJ's Decision in this matter conforms to the five-step process outlined above. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of August 6, 2013. (Tr. 15) The ALJ found that Plaintiff had severe impairments of degenerative disc disease, tendonitis of the left shoulder, obesity and "a mental impairment variously diagnosed as bipolar disorder, borderline personality disorder and schizoaffective disorder." (<u>Id.</u>) The ALJ found that she had non-severe impairments of hepatitis C, hypertension, gastroesophageal reflux disease, temporomandibular joint disorder, recurrent urinary tract infections, chronic bronchitis, and poly substance abuse. (<u>Id.</u>)

The ALJ found that none of Plaintiff's impairments or combination of impairments met the criteria for the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 or was medically equivalent thereto. (Tr. 15) Specifically, he analyzed her eligibility for Listing 1.04 (Disorders of the spine) and Listing 1.02 (Major dysfunction of a joint) and found that despite

use of a cane, she had generally effective ambulation and maintained both fine and gross dexterity. (Tr. 16) As to her mental impairments, the ALJ considered Listings 12.03 (schizophrenic, paranoid, and other psychotic disorders), 12.04 (affective disorders), and 12.08 (personality disorders), and the "paragraph B" criteria. (Id.) The ALJ found that Plaintiff displayed only mild restriction on activities of daily living, as she was able to take care of her personal needs, perform household cleaning activities, and live independently. (Id.) Plaintiff was determined to have moderate limitations in social functioning. (Id.) The ALJ also found that Plaintiff had moderate difficulties in maintaining concentration, but was able to understand, remember and carry out routine tasks of daily living. (Id.) The ALJ noted that Plaintiff had one to two episodes of decompensation, but noted that she was not receiving any treatment, was not currently on any psychotropic medications, and no further episodes were anticipated. (Id.)

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to –

> perform light work as defined in 20 CFR 416.967(b) except that [ ] she can lift and carry 20 pounds occasionally and 10 pounds frequently and stand/walk 6 hours in an 8-hour workday, she requires a cane to walk. She does not require a cane to stand. She can sit 6 hours in an 8-hour workday too but cannot climb ladders, ropes, or scaffolds. She can only occasionally balance, kneel, crouch, crawl, stoop, or climb ramps or stairs. She cannot perform overhead tasks with the nondominant left upper extremity but can frequently reach in other directions. She can do simple and routine tasks that involve working primarily with things rather than people and that can be performed independently in a nonpublic setting, and beyond that, she can have no more than occasional interaction with coworkers and supervisors.

(Tr. 17)

In assessing Plaintiff's RFC, the ALJ summarized the medical record, as well as Plaintiff's own statements regarding her abilities, conditions, and activities of daily living. While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he also determined that her statements regarding their

intensity, persistence and limiting effect were "not entirely credible." (Tr. 18)

In terms of her reduced credibility, the ALJ noted that Plaintiff's pain issues were intermittent, with treatment being generally conservative and of limited duration. (Tr. 20) He also noted that his inclusion of any limitation in the RFC due to left shoulder tendonitis was "generous," as there is scant indication in the medical records that her shoulder issue lasted at least 12 months or remained severe at the time of the Decision. (Tr. 19)

The ALJ also discounted the intensity and limiting effects of her mental health condition, as she had been without medical or therapeutic treatment since November 2013 while staying "within normal limits." (Tr. 20) He also noted that she had specifically declined psychological or psychiatric referral when establishing primary care in August 2014 and continued to display normal mood and affect. (Tr. 19)

The ALJ further found that to the extent Plaintiff's activities of daily living are somewhat limited, the medical evidence did not suggest a reason for such limitation. (Tr. 20) He noted that there was no record of any physician putting any restrictions on her exertional activities. (Id.)

The ALJ concluded that Plaintiff could not return to her past relevant work as a cashier, fast food worker or packer. (Tr. 21) He found that her age placed her in the "younger individual" category for the Medical-Vocational Guidelines ("Guidelines") and that she had a high school education and was able to communicate in English. (Id.) As such, he found that the Guidelines supported a finding that she was not disabled.

Based the VE's answers to hypothetical questions, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act because someone with her age, education and functional limitations could perform other work that existed in substantial

numbers in the national economy, namely as a hand packager (DOT 920.687-030), product assembler (DOT 559.687-034) or a surveillance system monitor (DOT 379.367-010). (Tr. 22) As such, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security statute and regulations. (Id.)

## Discussion

A court's role on review of a Social Security case of this nature "is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). The ALJ's decision in this matter is generally thorough and thoughtful. Plaintiff does not challenge any of the ALJ's determinations at Steps One through Four, including the adverse credibility determination. Having reviewed the record as a whole, the undersigned believes those determinations are supported by substantial evidence.

Plaintiff's arguments focus on alleged errors at Step Five. At Step Five, the ALJ considers a claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. See 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v). Through Step Four, the burden remains with the claimant to prove that she is disabled. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. See Thompson v. Colvin, 174 F. Supp. 3d 1080, 1086 (E.D. Mo. 2016) (citation omitted).

Plaintiff raises two different Step Five issues. Plaintiff first contends that there was an apparent conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT") which the ALJ did not resolve. As such, the ALJ's reliance on the VE's testimony was

not warranted, and his decision lacked substantial evidentiary support. Plaintiff next contends that, at the time of the decision, her age placed her at the borderline between age categories and the ALJ failed to consider her potential borderline age in rendering his decision.

## I. The VE's Testimony and the DOT

Plaintiff's first argument is that there are unresolved conflicts between the VE's testimony regarding work a person with her RFC could perform and the actual requirements of such jobs, as reflected in the DOT and the companion SCO. The Commissioner contends that there were no conflicts at all, and even if there were conflicts regarding two of the exemplary jobs, there was no conflict regarding the third job.

### A. Relevant Legal Standards – VE Testimony

A VE's testimony at Step Five should normally be consistent with the DOT. See Social Security Ruling (SSR) 00-4p. When a VE's testimony is inconsistent with the DOT, the VE must provide a reasonable explanation, which the ALJ may then accept. See Moore v. Colvin, 769 F.3d 987, 990 (8th Cir. 2014) (citing Welsch v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014)). Thus, "the ALJ has an affirmative responsibility to ask about 'any possible conflict' between VE evidence and the DOT, and its companion publication (the SCO), on the requirements of a job or occupation before relying on VE evidence to support a determination of not disabled." Kemp v. Colvin, 743 F.3d 630, 633 (8th Cir.2014) (citations and footnote omitted); see also Moore, 769 F.3d at 989. "If there is an 'apparent unresolved conflict' between the VE testimony and the DOT, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation … provides a basis for relying on the [VE] testimony rather than the DOT information.'" Moore, 769 F.3d at 989-90 (quoting SSR 00-4p, 2000 WL 1898704 at *2-4 (Dec. 4, 2000)). In Moore, the Eighth Circuit explained that an "ALJ is not absolved of this

duty merely because the VE responds 'yes' when asked if her testimony is consistent with the DOT." Id. at 990 (citing Kemp, 743 F.3d at 633). "Absent adequate rebuttal … VE testimony that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs" that the claimant may perform.'" Id. at 990 (quoting Kemp, 743 F.3d at 632).

**B.    Analysis**

As noted above, the ALJ found that Plaintiff had the RFC to –

perform light work as defined in 20 CFR 416.967(b) except that [ ] she can lift and carry 20 pounds occasionally and 10 pounds frequently and stand/walk 6 hours in an 8-hour workday, she requires a cane to walk.  She does not require a cane to stand. She can sit 6 hours in an 8-hour workday too but cannot climb ladders, ropes, or scaffolds. She can only occasionally balance, kneel, crouch, crawl, stoop, or climb ramps or stairs. She cannot perform overhead tasks with the nondominant left upper extremity but can frequently reach in other directions. She can do simple and routine tasks that involve working primarily with things rather than people and that can be performed independently in a nonpublic setting, and beyond that, she can have no more than occasional interaction with coworkers and supervisors.

(Tr. 17)   This RFC was reflected in the primary hypotheticals posed to the VE during the hearing.  (Tr. 54-55)  The VE opined that a hypothetical person with Plaintiff's age, education, work history, and RFC could perform the requirements of representative jobs such as hand packager (DOT 920.687-030), product assembler (DOT 559.687-034), and surveillance system monitor (DOT 379.367-010).  (Tr. 55)  Each of these positions was at the sedentary level, with an SVP 2.  The ALJ specifically asked the VE whether his testimony conflicted with the DOT or SCO, and the VE represented that there were no conflicts other than his testimony regarding absenteeism and Plaintiff's use of a cane.  (Tr. 56)

*1.    Hand Packager and Product Assembler Jobs*

Plaintiff contends that the DOT requirements for the hand packager and product

assembler positions require frequent reaching in all directions, yet her RFC precludes her from work that would require her to perform overhead tasks with her nondominant (left) upper extremity. Thus, according to Plaintiff, there is an apparent conflict between the VE's testimony and the DOT, and the ALJ did not take adequate steps to resolve the conflict.

The parties correctly note that the Eighth Circuit addressed similar situations in Kemp and Moore. In those cases, the Eighth Circuit reversed the Commissioner's denial of benefits due to unresolved conflicts between DOT requirements for jobs that involved reaching and a VE's testimony based on an RFC that included reach-related limitations. See Moore, 769 F.3d at 989; Kemp, 743 F.3d at 633. The Commissioner attempts to distinguish Kemp and Moore factually, noting that the claimants in those cases had limited ability bilaterally while Plaintiff herein is limited with respect to her nondominant (left) arm only. (See ECF No. 22, at p.6)

The Court finds that Plaintiff's limitation regarding her nondominant upper extremity creates an apparent conflict that should have been, but was not, resolved. For the hand packager job, DOT 920.687-030 requires the ability to reach "constantly." The hypothetical posed to the VE, and included in Plaintiff's RFC, limited Plaintiff to frequent reaching with her left arm.[6] "Frequently" is defined as one-third to two-thirds of the time, while "constantly" refers to more than two-thirds of the time. See Moore, 769 F.3d at 989 (constantly); Kemp, 743 F.3d at 633 (frequently). The difference between constant and frequent reaching creates an unresolved conflict between the VE's testimony and the DOT. The VE offered no testimony to explain the conflict. Thus, substantial evidence does not support the ALJ's reliance on the VE's testimony regarding the hand packager job in concluding that Plaintiff is not disabled under the Act.

There is a similar, but less pronounced problem with the product assembler job. DOT

---

[6] The hypothetical and RFC also precluded overhead tasks with the left arm.

559.687-034 includes a requirement of frequent reaching, which superficially would not necessarily conflict with the VE's testimony. Appendix C to the SCO, however, defines "reaching" as "[e]xtending hand(s) and arm(s) in any direction." Since the ALJ determined that Plaintiff was unable to extend both hands frequently over her head, there is an apparent conflict here. Without clarification from the VE that a person could still perform this job without having to reach overhead with both arms, the possible conflict is unresolved and cannot be used to support a finding of non-disability.

2. *Surveillance System Monitor*

The third representative job offered by the VE presents a different set of concerns. The DOT requirements for a surveillance system monitor are as follows:

> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

DOT 379.367-010. Plaintiff contends that her RFC, and the hypothetical posed to the VE, are inconsistent with these requirements. Plaintiff's RFC limits her to "working primarily with things rather than people," in a "nonpublic setting," and with "no more than occasional interaction with coworkers and supervisors." Plaintiff contends that the DOT lists one of the temperaments as "Dealing with People," and that the job "requires frequent talking." (ECF No. 16 at p. 8) Thus, according to Plaintiff, there exists an apparent and unresolved conflict between DOT requirements for a surveillance system monitor job, and the VE's testimony that a person with her RFC could perform that job. The Commissioner disagrees, focusing primarily on the need to interact with the public or co-workers and supervisors. (See ECF No. 22 at p. 7-8) The

Commissioner does not fully address Plaintiff's concerns regarding the frequent talking requirement.

Plaintiff is correct that the SCO listing for DOT 379.367-010 indicates that the surveillance system monitor position requires frequent talking. Appendix C to the SCO defines talking as "[e]xpressing or exchanging ideas by means of the spoken word to impart oral information to clients or to the public and convey detailed spoken instructions to other workers accurately, loudly, or quickly." Plaintiff's RFC, and the corresponding hypothetical to the VE, limited Plaintiff to a nonpublic setting with only "<u>occasional</u> interaction with coworkers and supervisors." (Tr. 17, 55; emphasis supplied) While it may very well be that the job of surveillance system monitor can be performed with less than frequent talking, there is no testimony from the VE to support such a conclusion and resolve this conflict. Thus, there is an apparent and unresolved conflict between the VE's testimony and the DOT requirements which deprives the ALJ's decision of substantial support.

### C.   <u>Conclusion – Conflicts Between VE Testimony and the DOT</u>

In summary, the undersigned finds that there were, in fact, apparent unresolved conflicts between the VE's testimony and the DOT requirements for the three exemplary jobs. The record clearly demonstrates that the ALJ attempted to identify any possible conflicts between the VE's testimony and the DOT. As <u>Kemp</u> and <u>Moore</u> make clear, asking the VE about conflicts alone does not necessarily entitle the ALJ to rely on the VE's testimony. See <u>Moore</u>, 769 F.3d at 990 (citing <u>Kemp</u>, 743 F.3d at 633). The record in this matter does not indicate "whether the VE or the ALJ even recognized the possible conflict between" a claimant who could not perform overhead tasks with her left upper extremity and reach only frequently in other directions, and the DOT requirements for hand packagers and product assemblers. See <u>Kemp</u>, 743 F.3d at 633.

Similarly, the record does not indicate whether the ALJ or VE recognized a conflict between the surveillance system monitor requirement of dealing with people and frequent talking, and Plaintiff's limitation that she have only occasional interaction with coworkers in supervisors in a nonpublic setting.

Thus, absent further development of the record, "the Commissioner did not meet her burden at Step Five of the sequential evaluation process of establishing that jobs existed in the economy that [Plaintiff] was capable of performing." Kemp, 743 F.3d at 633 (citation omitted).[7]

## II.   Consideration of Plaintiff's Alleged Borderline Age

Plaintiff also argues that the Commissioner committed an independent reversible error at Step Five. At the time of the ALJ's decision, Plaintiff was six months and a few days from turning 50 years old. Thus, she was still a younger individual within the relevant standards. According to Plaintiff, had she been 50, she would have been classified as "approaching advanced age," and the outcome of her case would have been different. Plaintiff argues that the ALJ committed reversible error in not at least considering whether she was in a borderline age situation due to claimed additional vocational adversities.

---

[7] In Latragna v. Colvin, 2015 WL 4771630 (E.D. Mo. Aug. 12, 2015), the undersigned found, in part, no conflict between a VE's testimony and DOT requirements. In so doing, the Court explained that Moore and Kemp involved "apparent *actual* conflicts between the RFC given to the VE and the DOT requirements relied upon," meaning that the conflict related to a specific RFC limitation. Id. at *18. The undersigned concluded that the logic of Moore and Kemp do not extend to all *possible* conflicts, noting that "[a] contrary conclusion would be largely unworkable at the administrative level, [and] would undermine the deferential standard of review by permitting disappointed claimants to scan the DOT/SCO for any possible conflict, however small, and thereby short circuit the substantial deference normally accorded the Commissioner's disability determinations." In the present case, the conflicts at issue fall much closer to the situation in Moore and Kemp than that of Latragna.

This case is to be remanded in view of the apparent and unresolved conflicts between the VE's testimony and the DOT. Thus, the Court will defer resolution of this issue to permit the ALJ to consider it upon remand, should that be necessary.

### Conclusion

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and free from legal error. See Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015). Where, at Step Five, there is an apparent and unresolved conflict between the VE's testimony and the DOT, the VE's testimony "does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving that the existence of other jobs in the economy a claimant can perform." Moore, 769 F.3d at 990. In the instant case, there remain such conflicts. Therefore, the matter will be remanded. Although the Court is aware that the Commissioner's ultimate decision as to non-disability may not change after properly considering all the evidence of record and undergoing the required analysis, the determination is nevertheless one that the Commissioner must make in the first instance. See Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the final decision of the Commissioner denying benefits is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of September, 2017.